JAMES WHITE, Appellant, *v.* EDWARD LIVINGSTON, Appellant; HENRY J. BROWN and Others, Respondents, Impleaded with Others.

*Mechanic's lien — where the owner defaults in payments the contractor need not continue the work — effect of the acceptance of an order given by the contractor to a materialman — effect of the materialman not demanding payment thereof — rules as to the rights acquired by lienors — when the contract is severable — effect of the owner's completing the work — effect of a provision that, on default, the contractor shall receive no payment until the work is completed — supplemental agreement, void as to sub-contractors — form of notice of lien as to the Lien Law, and as to the particular building, and as to work done and materials furnished — money deposited with the county clerk to procure discharge of lien.*

Where a building contract provides for the payment of installments of the contract price at various stages of the work, and the owner refuses to make a payment which the contractor is entitled to demand, the contractor is not bound to proceed with the work, but may maintain an action against the owner to recover upon *quantum meruit* for the work done and materials furnished.

Where the owner, prior to the time when a particular payment becomes due under the contract, accepts an order, drawn by the contractor upon him in

favor of a materialman for a specified sum payable out of such payment, payable provided "value has been received," the materialman is entitled to recover the amount (not exceeding the sum specified in the order) due to him from the contractor, when such payment becomes due, and not simply the amount which was due to him (the materialman) when the order was delivered to the owner.

The order operates as an assignment *pro tanto* of the payment in question, and the materialman does not forfeit his right to recover such money from the owner by failing to demand payment thereof.

The rules relating to the rights acquired by a lienor by the filing of the lien are as follows:

"1. If anything is due to the contractor pursuant to the terms of the contract when the lien is filed, it attaches to that extent.

"2. If nothing is due to the contractor according to the contract when the lien is filed, but a certain amount subsequently becomes due thereunder, the lien attaches to the extent of that sum.

"3. If nothing is due to the contractor pursuant to the contract when the lien is filed, and he abandons the undertaking without just cause, but the owner completes the building according to the contract and under a provision thereof permitting it, the lien attaches to the extent of the difference between the cost of completion and the amount unpaid when the lien was filed."

When the work is abandoned by the contractor, and is completed by the owner pursuant to a right reserved in the contract, the owner's right to declare a forfeiture of the contract for non-performance is gone; the work of completion is deemed to be done under the contract and on account of the contractor, and the contractor becomes entitled to receive any balance of the contract price that may remain over and above the cost of completion.

A contract by which the contractor covenants to build several buildings upon the owner's premises, and to perform other work in connection therewith, which contract fixes a separate price and a different date of completion for each piece of work, is a severable contract. If the owner, pursuant to a right reserved in the contract, completes the work after its abandonment by the contractor, and it appears that the cost of completing any one or more of the separate pieces of work was less than the amount to which the contractor would become entitled if he had completed it, the owner is liable to materialmen and sub-contractors who have filed liens against the premises for the difference, notwithstanding the fact that the cost of completing all the work and the damages sustained by the owner exceeded the amount which would become due to the contractor under his contract.

A provision in the contract, that if the employment of the contractor by reason of his default shall be terminated, "he shall not be entitled to receive any further payment under this contract until said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor," only operates to postpone until the completion of the whole work payments which otherwise

would become payable at intervals, and it does not authorize, as against the lienors before mentioned, the application of moneys earned in the completion of one portion of the work to the payment of expenses incurred in the completion of another portion thereof.

A supplemental agreement entered into between the contractor and the owner, in which the sum of $1,000 was fixed as the damages which the owner had sustained by reason of the contractor's delays up to the time when the supplemental agreement was executed, and by which the contractor agreed to pay the sum of $50 for each and every day that the work should remain uncompleted after a certain date, is void as against sub-contractors, in so far as it attempts to convey to the owner any portion of the payments due or that might become due under the original contract.

A notice of lien, filed when the only Mechanic's Lien Law of the State of New York in force was chapter 342 of the Laws of 1885, is not defective because it fails to designate the act under which it was filed.

Section 20 of the act of 1885, which provides, "In case of several buildings erected, altered or repaired under one contract, and of conflicting liens, each lienor shall have priority upon the particular building or premises where his labor is performed or his material used," does not require that a notice of lien for work done under a contract for the erection of a residence and the outbuildings upon a gentleman's country place should state what portion of the materials furnished by the lienor entered into the construction of each of the buildings mentioned in the contract.

A notice of lien which alleges that the lienor entered into an agreement with the contractor for furnishing the plumbing for the dwelling house, stable and gardener's cottage mentioned in the contract for a certain sum, and that pursuant to such agreement the lienors had "furnished certain of the said materials and done a certain portion of the work of construction of said plumbing," but fails to state how much of the agreement had been performed, or the value of the work and materials actually done and furnished, is fatally defective.

Money constituting a portion of a payment earned by the contractor and deposited by the owner pursuant to an agreement with the contractor, with the county clerk, in order to discharge liens filed against the premises, belongs to the contractor and cannot be reached by a mechanic's lien subsequently filed.

APPEAL by the plaintiff, James White, from portions of a judgment of the Supreme Court in favor of certain of the defendants, entered in the office of the clerk of the county of Putnam on the 21st day of January, 1901, upon the report of a referee, and also an appeal by the defendant, Edward Livingston, from the whole of said judgment.

*Hector M. Hitchings*, for the appellant White.

*L. Laflin Kellogg*, for the appellant Livingston.

*Frederick P. Bellamy* and *I. N. Sievwright*, for the respondents Henry J. Brown and another.

*Franklin Couch*, for the respondents Dain.

*Charles De Hart Brower*, for the respondent Kimber.

Judgment affirmed, with costs, on the opinion of HAMILTON ODELL, Esq., referee.

All concurred.

The following is the opinion of the referee:

HAMILTON ODELL, Referee:

The action is brought to foreclose a mechanic's lien. The plaintiff is a sub-contractor. The defendant Livingston is the owner of the property. The defendants Mapes are the contractors. The defendant Kimber is their assignee for the benefit of their creditors. The defendant Weeks, as clerk of Putnam county, is alleged to have in his hands certain moneys deposited with him by Livingston for the purpose of discharging liens filed against the property, which liens, it is asserted, were illegal and without force. The other defendants are lienors, as sub-contractors, materialmen and laborers.

On May 13, 1895, Mapes & Son contracted with Livingston to furnish materials and labor and erect a brick dwelling house, a brick stable, a brick gardener's cottage, a brick icehouse, a brick and stone bridge and a wooden shed, and to sink an artesian well and construct roads and do other work on premises belonging to Livingston and situated near Highland Station, in the county of Putnam. Different dates were fixed for the completion of different portions of the work. Payments were to be made in installments as the work progressed. No payment could be demanded unless, with the demand, the contractors produced the certificate of the supervising architect or engineer. No installment could become payable so long as any liens filed against the property were undischarged of record. In case the contractors should fail to supply sufficient labor or material, or to prosecute the work with diligence, and the architect or engineer should certify that such failure was sufficient ground for such action by the owner, the owner should be at liberty to " termi-

nate the employment of the contractor" and enter into possession, of the premises and complete the work, and the contractor should not be entitled to receive any further payment under the contract until the work should be fully finished, "at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor; but, if such expense shall exceed such unpaid balance, the contractor shall pay the difference to the owner."

The date fixed by the contract for the completion of the dwelling house ready for occupancy was September 1, 1895. The cottage and bridge were to be completed by the first day of June; the icehouse by the fifteenth of June; the stable and shed by the first of July. The contractors did not perform in either of these particulars. About the 23d of January, 1896, they abandoned the work, leaving various portions of it, and especially the dwelling house, uncompleted. The architect certified that the defaults of the contractors were sufficient grounds for the termination of their employment by Livingston, and a like certificate was given by the engineer having supervision of a portion of the work. Thereupon Livingston gave notice that the employment was terminated and contracted with other parties, who did what was left undone by Mapes & Son. The plaintiff's notice of lien was filed on January twenty-second.

It is claimed in behalf of the lienors or some of them that Livingston unreasonably interfered with the contractors, whereby the work was hindered and delayed, and that he refused to make payments which became due and payable by the terms of the contract, and that, therefore, the contractors were justified in abandoning the work and are entitled to recover the full value of all labor performed and materials furnished. I have carefully examined the testimony relating to this charge of wrongful interference, and my opinion is that the charge is not supported. It is undoubtedly true that Livingston maintained a vigilant watch over the work as it progressed, and that he expressed dissatisfaction with some portions of it and with some of the materials provided by the contractors, and that he made various complaints that the work did not comply with the contract, some of which complaints were regarded and others were not, and that some delays, not very considerable, resulted

from such action upon his part. These "interferences" by Living-ston could not have been so serious as counsel now represent them to have been, for it does not appear that the contractors made any objection or complaint or that such interferences were the cause, or partly the cause, of their abandonment of the work. They abandoned the work because they were without means to complete it, and because liens to a large amount had been filed against the property, which they were unable to remove. It is alleged in the complaint that the failure of Mapes to fully complete the contract " was wholly caused by the delay and refusal on the part of the defendant Edward Livingston in meeting the payments as they became due and by his neglect and refusal to perform his part of said contract," and the learned counsel for the plaintiff says that " the real cause of the subsequent liens being filed " was that Livingston " would not pay Mapes the money which belonged to him." This presents the real issue between Mapes and Livingston. Was Livingston in default under the contract? Did he refuse to make payments which had become due and which Mapes had the right to demand? If he did, then the contractors were no longer bound to proceed with the work and had a valid claim against Livingston upon *quantum meruit* for work done and materials furnished. (*Thomas* v. *Stewart*, 132 N. Y. 580; *Wright* v. *Reusens*, 133 id. 306.)

By the contract Mapes was entitled to a fourth payment on account of the dwelling house " when third story walls built, frame work for roof and dormer roofing complete, with copper put on, four thousand dollars; " and to a final payment on account of the stable " when stable is entirely completed, with water introduced, ready for use, two thousand three hundred and nineteen dollars." As already mentioned, it was expressly agreed that " in no case shall a payment be demanded unless accompanied by a certificate signed by the supervising architect or engineer, as the case may be; " and also that " no payment shall be demanded by, or become payable to, the (contractors) so long as any liens remain undischarged of record." On January 11, 1896, Pelham, the architect, issued to Mapes a certificate that the said payment of $4,000 had become due. The work embraced in this certificate had been completed for some days prior to that date. It does not appear that the certificate was intentionally delayed by Pelham. Mapes testi-

fies: "I don't think that he refused to give the certificate on that occasion. I think he gave it to me as soon after as he could go there and see it." The certificate was presented to Livingston on the fourteenth of January. At that time there were outstanding two orders drawn on Livingston by Mapes against the $4,000 payment, one for $1,350 in favor of Brown & Son, and the other for $500 in favor of Blackburn & De Graw, both sub-contractors. There were also numerous mechanics' liens of record against the property, amounting to upwards of $1,500. For these reasons Livingston declined to make the payment. He testifies (and is not contradicted): "I told him (Mapes) that we could not pay it, because there were liens filed against the property, and, moreover, he had issued orders on me for two different parties, one Blackburn & De Graw, and the other in favor of Brown, and that they ought to be disposed of before I made any payment — at any rate, as long as the liens were there I could not entertain any idea of payment." By the terms of the contract Mapes was required, and he agreed, in case any liens were filed for labor or materials, "to procure said lien or liens to be forthwith discharged according to law;" and in case of his failure so to do, Livingston was "authorized, at his option, to deposit in the clerk's office a sufficient sum to discharge such liens according to law, and such deposit shall be deemed a payment under this contract on account of said work." Mapes told Livingston that he could not pay the liens, and requested Livingston to deposit with the county clerk sufficient money to discharge them, so that "he might get the rest of the money and go on with the work." Livingston consented to do this, first, however, exacting from Mapes a supplemental agreement, to which brief reference will by and by be made. On January fifteenth the deposit was made and the liens were discharged. Mapes does not testify that any demand or request for any part of the balance of $4,000 was thereafter made by him. Livingston says as follows: "When we came back to New York he wanted the balance of what he claimed, the balance of the money, paid. I told him that I could not pay that to him as long as these orders were outstanding. * * * He said : 'I will get those back; there will be no trouble about that;' and he went over to see Blackburn & De Graw and he did get it cancelled. * * * With regard to Brown, he said it would take

some time to negotiate with Brown, and when he came on the 15th of January, he said he could not get Brown's yet, but he said he would, * * * and when we came back from Carmel in the evening I offered to pay the balance that seemed to be due on that order, provided he would designate the parties to whom it should be paid — it would either go to Brown — if he could not get the order back from Brown, that some of it must go to Brown and the other parties that he should name * * · * — he should designate the parties to get the money, and he said he was not ready to do that. He said he was going to get that order back from Brown ; he wanted Brown paid, and he was going to get it back, and that I had better hold the money for a few days until he could get around and make bargains with the people, and see where he could place the money to do the most good." In accordance with this suggestion Livingston retained the money, and before anything further was done by Mapes, liens amounting to about $20,000 were filed against the property. Mapes confessed his inability to remove the liens or to go on with his contract, unless Livingston would make advances, which he declined to do. Thereupon Mapes quit the work.

As to the stable, it is admitted that it was not entirely completed by Mapes. Just how much remained to be done is matter of dispute. The preponderance of proof is that it was substantially finished. Pelham, the architect, so testifies. But there is no proof that any demand was ever made by Mapes for the final payment, or that he ever procured or applied for the certificate of the architect that the final payment had become due.

Upon the testimony I must find that Livingston did not default in making payments according to his contract, and that Mapes was not justified by any act or omission of Livingston in abandoning the work. Therefore, Livingston did not become liable to Mapes upon *quantum meruit*. (*Robinson* v. *Chinese Charitable Association*, 47 App. Div. 69, 70.)

After the liens had been discharged by the deposit made by Livingston on the fifteenth of January, there was due to Mapes on account of the fourth payment on the house the sum of $2,428.29. Against this payment Mapes had drawn an order for $1,350 in favor of Brown & Son. This order had been presented by Brown & Son to Livingston on November 21, 1895, and had remained in

Livingston's possession. It was an assignment, *pro tanto*, of that fourth payment. (*Lauer* v. *Dunn*, 115 N. Y. 409; *Stevens* v. *Ogden*, 130 id. 185; *Bates* v. *Salt Springs Nat. Bank*, 157 id. 322.) There is no lien now in existence which antedates the order. (*Beardsley* v. *Cook*, 143 N. Y. 150.) It is insisted by the plaintiff that the order is an assignment out of the fourth payment of only such a sum as was due from Mapes to Brown on November 20, 1895, the day when the order was delivered. *Bates* v. *Salt Springs Nat. Bank* (*supra*) appears to be an authority to the contrary. Counsel is in error in saying that in that case the assignment was made in payment of a debt already accrued. In the opinion of the court the fact is stated to be that " before any work had been performed under the contract, the contractors assigned in writing to the defendant, the Salt Springs Bank, the last payment to be made on said contract, as collateral security for their existing and future indebtedness to the bank." The plaintiff further insists that, under no circumstances, can Brown & Son recover upon this order more than $1,100, that being the total amount due to them, at the date of the filing of the plaintiff's lien, for work and materials done and furnished in the construction of the dwelling house. But Mapes was also indebted to them in a considerable sum for work done on the other buildings, the stable, cottage, icehouse and shed, and the order applied to any and all labor and materials furnished by Brown & Son under their contract with Mapes. Certainly, unless prevented by liens filed, Mapes was at liberty, out of payments falling due upon the house, to pay a sub-contractor for labor or materials expended upon any portion of the work.

It is admitted by Livingston that the order referred to was presented to him by Brown & Son on November twenty-first. He retained it in his possession. He recognized it as a valid order, upon which he was liable, in January, when, after the liens were discharged by the deposit, Mapes asked for the remainder of the fourth payment. Livingston now claims that he was not bound to pay the $1,350 to Brown & Son, because the order was conditional —*first*, upon a performance of their contract with Mapes, and, *second*, in that it was payable provided " value has been received." To entitle Brown & Son to payment of the order it was only

necessary that the fourth payment on the house should become due. to Mapes (which it did upon the production of the architect's certificate and the discharge of the liens) and that Brown & Son, by a partial performance of their contract with Mapes, should have rendered value to the amount of the order over and above any prior payments (about which there is no dispute). Upon these facts the title to so much of the fourth payment passed to Brown & Son. Livingston was not in any default in not paying it to Brown & Son, because they made no demand upon him after the order became due and payable, but they did not forfeit their right to the money by failing to demand its payment, and they are entitled to have judgment for it in this action.

The rules relating to the rights acquired by a claimant by the filing of a lien are stated in *Van Clief* v. *Van Vechten* (130 N. Y. 577) as follows: " 1. If anything is due to the contractor pursuant to the terms of the contract when the lien is filed, it attaches to that extent.

" 2. If nothing is due to the contractor according to the contract when the lien is filed, but a certain amount subsequently becomes due thereunder, the lien attaches to the extent of that sum.

" 3. If nothing is due to the contractor pursuant to the contract. when the lien is filed, and he abandons the undertaking without just cause, but the owner completes the building according to the contract and under a provision thereof permitting it, the lien attaches to the extent of the difference between the cost of completion and the amount unpaid when the lien was filed."

It is also settled that when work is abandoned by a contractor, and is completed by the owner pursuant to a right reserved in the contract (as in this case), the owner's right to declare a forfeiture of the contract for non-performance is gone, the work of completion is deemed to be done under the contract and on account of the contractor, and the contractor becomes entitled to receive any balance of the contract price that may remain over and above the cost of completion. (*Murphy* v. *Buckman*, 66 N. Y. 297; *Graf* v. *Cunningham*, 109 id. 369; *Van Clief* v. *Van Vechten, supra.*)

When Mapes stopped work about January 23, 1896, Livingston, as already mentioned, procured from the architect and engineer the required certificates, and then notified Mapes that his employ-

ment as contractor was terminated, and that he (Livingston) would employ " other persons to finish said work and provide materials therefor." This he did, and it is now claimed that the cost of finishing the contract and the damages sustained by Livingston by reason of the default of Mapes exceeded " the amount which would have become due to the said Frank Mapes & Son if they completed the said work under their said contract" by the sum of $649.54. This may be so, and yet Livingston may be liable to these lienors for moneys which became due under the contract after the abandonment. The work covered by the contract was not to be done by Mapes & Son for a gross sum. For each separate piece of work a stipulated price was to be paid. The contract was not entire. " A contract is entire when the parties intend that the promise by one party is conditional upon entire performance of his part of the contract by the other party. The contract is said to be severable when the part to be performed by one party consists of several distinct and separate items, and the price to be paid by the other is apportioned to each item or is left to be implied by law." (*Ming* v. *Corbin,* 142 N. Y. 340.) Mapes contracted to build a brick dwelling house, to be completed by September 1, 1895, for which he was to be paid the sum of $21,719. He also contracted to build a brick stable, to be completed by July first, for which he was to be paid the sum of $5,319. When he stopped work the house was only partially built. It cost Livingston nearly $13,000 to finish it. But the stable was substantially completed. There is proof that the cost of doing the things left undone would not exceed $70. Livingston testifies that the stable was completed by Emslie at a cost of $345 for labor and materials. This, I suspect, included some work not called for by the original specifications. When the work was done, the final payment of $2,319, less the cost of completion, was earned, regardless of the condition of the dwelling house or roads, and to it the liens filed, or some of them, attached.

In *Foshay* v. *Robinson* (137 N. Y. 134) the work contracted for was to be paid for in installments; each payment was conditional upon the production of the architect's certificate; in case the contractor should neglect to provide sufficient materials or workmen, the owner was at liberty to take the work in his own hands and finish it. This he did after notice to the contractor, which was dis-

SECOND DEPARTMENT, FEBRUARY TERM, 1902.          [Vol. 69.

regarded. At that time the contractor had nearly completed the plastering on the building. Had he completed it he would have been entitled to a payment of $1,800. The cost to the owner of completing it was $280. The fact appeared that in finishing the work the owner expended a sum in excess of what the contractor would have earned had he performed his contract. The court held, therefore, that the contractor himself was not entitled to any lien; but that "inasmuch as when the lien of the materialmen was filed there was, in fact, due by the terms of the contract from the owner a certain sum of money, such an obligation of the owner inured to the benefit of the materialmen, subject, however, to such deductions as should be allowed for the expense of completing the plastering and for remedying defects in the past work." It held, further, that the fact that the owner eventually expended in entirely finishing the house more than remained due under the contract could not affect the question of the owner's obligation as it existed at the time when the lien of the materialmen was filed; and that "had the contractor wholly completed the building at the plastering stage he would certainly have been entitled to the installment, and its completion by the owner was in place of the contractor as to the materialmen, and as to them created the liability over, lessened only by what he was obliged to expend to bring the building up to the stage mentioned in the contract as the time for the third payment. The moneys were earned at that time, and the liens of these materialmen at once attached."

It is insisted by the learned counsel for Livingston that the *Foshay* case is not an authority in favor of these lienors, for the reason that in the case at bar the contract provided that if the employment of the contractor should be terminated, "he shall not be entitled to receive any further payment under this contract until said work shall be wholly finished, at which time, if the unpaid balance of the amount to be paid under this contract shall exceed the expense incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor." It seems to me that the most that can be claimed for this provision is that, under the condition mentioned, payments which, by the terms of the contract would otherwise become payable at intervals, are postponed until the completion of the whole work. It does not

change the character of the contract or authorize the application of moneys earned by the completion of the stable to the payment of expenses incurred in the completion of the dwelling house or of damages sustained by Livingston through the delays and defaults of Mapes.

The claim that the cost of completing the work, etc., exceeded, by $649.54, the amount which would have become due to Mapes had he performed his contract, rests upon the certificates of Pelham, the architect, and Cauldwell, the engineer. It was provided in the contract between Livingston and Mapes that, in case the contractor's employment should be terminated and the work be completed by the owner, "if the unpaid balance of the amount to be paid under this contract shall exceed the *expense* incurred by the owner in finishing the work, such excess shall be paid by the owner to the contractor;" and that "the expense incurred by the owner as herein provided, either for furnishing materials or for finishing the work, and any damage incurred through such default, shall be audited and certified by the architect or engineer, as the case may be, whose certificate shall be conclusive *upon the parties.*" The certificate of the architect above referred to includes an item of $1,000 for "liquidated damages" and another item of $2,750 for "$50 per day from 1st April to 25th May, the date Emslie & Son agreed to have building complete, say 55 days at $50." Both of these items are claimed under the supplemental agreement made between Livingston and Mapes on the 15th of January, 1896, in which the sum of $1,000 was fixed as the damages which the agreement recites Livingston had sustained to that date by reason of the delays and defaults of Mapes, and by which it was agreed that in case Mapes should fail to complete his contract by the first of April he should "pay to said Livingston, as liquidated damages, the sum of ($50) fifty dollars for each and every day after that date that any part thereof remains not completely finished, which, if not paid, it is agreed shall be deducted from any money due under the said contract." Whether or not that supplemental agreement was valid for one purpose or another as between the parties to it, it is plain, I think, that as against sub-contractors it was inoperative and void, in so far as it attempted to cover into Mr. Livingston's pocket any portion of the payments due or that might become due under the original con-

tract. The engineer certifies that the expense incurred by Livingston "for completing said contract under and pursuant to Article Fourth, or Subdivision Fourth, of said contract, including the furnishing of all materials and the finishing of all the work, incurred through the default of the said contractors, Frank Mapes & Son, for work on roads, gravel and wall, was the sum of Four thousand and forty-five dollars and sixty-seven cents ($4,045.67)." Whether this was in excess, and if so, how much in excess, of the contract price, does not appear.

If I am right in my construction of the contract it follows that Livingston or his property is liable in some amount to the lienors, and the next question is — in what amount?

*First.* There is the sum of $2,428.29, being the amount of the fourth payment on the house (which was past due when the contractor's employment was terminated), less the sum deposited by Livingston with the county clerk.

*Second.* There is the sum of $1,974, being the amount of the final payment on the stable, less $345, the alleged cost of completion.

*Third.* There is the sum of $145.21, being the difference between the cost of completing the dwelling house and the amount unpaid (exclusive of the fourth payment), when the liens were filed. In determining this amount I have taken into account the $399.81 allowed by Emslie for materials upon the ground when he began his work.

*Fourth.* There is the sum of fifty-seven dollars unpaid on the contract price of the icehouse, which was completed by Mapes. The iron door which was provided by Livingston at a cost of thirty-six dollars and fifty cents was not called for by the specifications.

These together make a total of $4,604.50. It is claimed that an allowance should be made for work done by Mapes upon the roads, for which he was not paid. I am unable from the testimony to determine the amount of such work not paid for, or what would be a proper allowance therefor. It is claimed that a further allowance should be made for various items of extra work done, it is alleged, by direction of Livingston or his architect. All of these items are, I believe, disputed by Livingston, and it can hardly be said that the proof preponderates in favor of the claimants.

The next question relates to the validity and priority of the

several liens. The claim of Dain's Sons, materialmen, is for $2,794.28. Notice of lien was filed on January 18, 1896. The claim of Brown & Son, sub-contractors, is for $4,654.55. Notice of lien was filed on January twentieth. The claim of the Riverside Bank, assignee of Blackburn & De Graw, sub-contractors, is for $2,590. Notice of lien was filed on January twentieth, at a later hour than Brown's. The claim of the plaintiff, a sub-contractor, is for $3,075. Notice of lien was filed on January twenty-second.

The lien of Dain's Sons is attacked by the plaintiff as invalid, because the notice fails to designate the act under which it was filed, and also because it fails to separately specify what portion of the materials furnished entered into the construction of each of the buildings mentioned in the contract between Mapes and Livingston. The first objection must be overruled. Section 4 of the act of 1885 (Chap. 342) prescribed what a notice of lien should contain : The act was a public act. When the notice was filed there was no other Mechanic's Lien Law "of the State of New York." The second objection is not well taken. The 1st section of the act of 1885 declared that a claimant might have a lien upon a building and its appurtenances and upon the "lot, premises, parcel or farm of land" upon which the same might stand, upon filing the notice prescribed in section 4. The notice was required to contain, among other things, "the nature and amount of the labor and service performed, or the materials furnished or to be furnished  *  *  *  and also a description of the property to be charged with a lien sufficient for identification." There was no requirement that when materials were furnished for several buildings erected on the same parcel or premises the notice should state what portion thereof was used in the erection of each. In the 20th section it was provided : "In case of several buildings erected, altered or repaired under one contract, and of conflicting liens, each lienor shall have priority upon the particular building or premises where his labor is performed or his material used." Clearly this had nothing to do with the *creation* of a lien which was wholly regulated by the provisions of section 4. Dain's Sons acquired a lien upon the entire premises owned by Livingston at Highland for materials furnished for and actually used in the construction of (at least) the dwelling house and stable. The plaintiff has a later lien upon the same premises for work done upon and

materials used in the dwelling house alone. Dain's Sons are unable to state how much of the materials furnished by them went into the house, and the question is whether, for that reason, their claim against the house as part of the premises must be postponed until the plaintiff's claim is satisfied. I don't think so. In a case like this it seems to me that the above-quoted provision of section 20 is incapable of execution. All of the numerous lienors — sub-contractors, materialmen, teamsters, day laborers on the roads, etc., have charged their liens upon a "parcel of land" owned by Livingston in the town of Phillipstown. Its area is unknown. The proof shows that the property is a gentleman's country place, consisting of a residence and outbuildings and improved grounds, drives, etc. It is an entire thing, each part of it having a close relation to every other part. The relief demanded in the complaint is that the "said premises" be sold and the proceeds be applied to the payment of the plaintiff's lien. Certainly this demand goes beyond anything that the plaintiff has the right to claim under section 20. Under that section the most that he could claim would be priority of lien upon the dwelling house. Other liens take precedence of his as to the remainder of the premises at least. If the plaintiff has a first lien upon the house it can only be enforced by a separate sale of the house, which, considering the character and situation of the property as a whole (*Lauman's Appeal*, 8 Penn. St. 477; *Griel's Appeal*, 8 Cent. Rep. 868), appears to me to be impracticable in the highest sense. Nor does the plaintiff demand any such relief. My conclusion is that the lien of Dain's Sons is a first lien upon the whole of the premises. No proof was offered in support of their alleged lien filed for materials furnished to Brown & Son.

The plaintiff also attacks the lien of Brown & Son on the ground that the notice filed contains statements which are false, by which the lien is vitiated. It is said that Brown had a written contract with Mapes for furnishing material, and that in filing his lien he "deliberately puts aside" the terms of his written contract, "and makes his claim for what he calls the value of his work and material." Brown's contract with Mapes was to perform all work and provide all materials for "all the work called for in the carpenter's specifications, except heating for residence, stable, gardener's cottage, icehouse and woodshed" for the sum of $10,787, to be paid in install-

ments as the work proceeded. In his notice he claims a lien for the " price and value " (using the words of the statute) of certain labor *performed* and materials *furnished*. He describes the labor as " carpenter work done and performed in and about the erection and construction " of the several buildings, and the materials as " necessary lumber, timber, hardware and materials required in and about the doing and performing of said work," all amounting at the time of the filing of the notice to $4,492.55. He claims also the sum of $162 for work and materials *to be* done and furnished in and about the completion of the stable. He states that such work and materials were done and furnished, and to be done and furnished, under and pursuant to a contract between Livingston and Mapes and a sub-contract between Mapes and Brown & Son, and that " all of the work and materials for which the claim is made has been actually performed or furnished, except as aforesaid, in respect to the completion of the stable." I do not find here any disregard by Brown of his written contract with Mapes. On the contrary, it plainly appears that the entire claim of Brown & Son arises out of the part performance of that contract. If Brown & Son were entitled to any lien it would, under the circumstances, necessarily be for the value of their labor and materials. Their notice was not, as counsel claims, defective and insufficient because it failed to state the amount of the work contracted for " still to be performed." Such a statement was not required by the act of 1885, but only " whether all the work for which the claim is made has been actually performed or furnished, and if not, how much of it." If Brown's notice is defective in this particular, so also is the plaintiff's. Another objection is that Brown's notice is false in its statement of the amount due; that the amount claimed by him is " grossly excessive." In his notice Brown claims $4,492.55. The amount actually due to him it is said was $3,208. This latter sum represents, as I understand it, the balance of payments which, under Brown's contract with Mapes, had become due prior to January twenty-third, the date when Mapes ceased work. The testimony of Mr. Brown is, and there is no contradiction, that the value of the work done and materials furnished by him prior to that date, over and above all payments, was $4,446. For this sum he was entitled to a lien. I can discover no important or material statement in the

notice of which it can be said that it is willfully and intentionally false. (*Ringle* v. *Wallis Iron Works*, 149 N. Y. 439.) Counsel is in error in saying that it is stated in the lien that $4,564.55 " was the amount *agreed upon* as being due."

The claim of the defendant, the Riverside Bank, assignee of Blackburn & De Graw, must be dismissed. The notice of lien is fatally defective. It alleges an agreement between Blackburn & De Graw and Mapes & Son for furnishing and constructing the plumbing for the dwelling house, stable and gardener's cottage for the sum of $2,290, and that, pursuant to such agreement, Blackburn & De Graw had " furnished certain of the said materials and done a certain portion of the work of construction of said plumbing." It fails to state how much of the agreement had been performed or the value of the work and materials actually done and furnished. (*McKinney* v. *White*, 15 App. Div. 423.)

The remaining question has to do with the deposit of $1,571.71 made by Livingston with the defendant Edward C. Weeks, county clerk of Putnam county, on January 15, 1896, for the purpose of discharging mechanics' liens then of record against the property. On behalf of the present lienors it is insisted that, for reasons assigned by them, the said liens had no validity, and that (as the learned counsel for the plaintiff puts it) the former lienors " acquired no lien upon the funds in suit, and thereby said funds went into a general fund of moneys due from Livingston to Mapes and became impressed with the liens of each and every valid lienor filing his lien prior to the general assignment to Kimber." Kimber, the assignee, contends that the fund, when deposited, became the money of Mapes and passed by the assignment free from any claim or lien of the present lienors.

The facts in brief are that Mapes & Son sub-let to James and Edwards a part of the work covered by their contract with Livingston, including the excavation of rock for cellars and sewers and the construction of roads. James and Edwards abandoned the work before completion. The various parties filed liens for labor and materials furnished to James and Edwards. It does not appear that any money was then or afterwards became due to them from Mapes. The liens referred to were of record when the $4,000 payment became due on the house, and, as before mentioned, Livingston

refused to make the payment until they were removed. At the request of Mapes, Livingston made the deposit and discharged the liens. All of the said lienors are parties defendants to this action, and all have answered the complaint, but neither of them has made proof of his right to any portion of the said deposit. By subdivision 2 of section 24 of the act of 1885 a lien might be discharged " by depositing with the county clerk, if before the suit, of a sum of money equal to the amount claimed, with interest to the time of such deposit." In such case the land is relieved and " the lien is shifted to the fund." (*Ward* v. *Kilpatrick*, 85 N. Y. 418.) The money deposited takes the place of the lien. (*People ex rel. Flynn* v. *Butler*, 61 How. Pr. 274.) To obtain the money the lienor is obliged to show a valid lien on the land. (*Raven* v. *Smith*, 76 Hun, 60.) The money is neither land, nor the proceeds of land, nor under the statute is it subject to any lien except that to secure which it was deposited. It is in the hands of the clerk, "impressed with a charge in favor of the lienor" (whose lien has been discharged) "for whatever amount he shall be able to establish against it." (*Hafker* v. *Henry*, 5 App. Div. 261.) Neither the plaintiff nor any other claimant whose notice was filed after the abandonment of the work by Mapes attempted to create a charge in his favor upon this deposit. They claimed only against the parcel of land at Highland. The statute provided for a lien upon lands and buildings and nothing else, and, in an action to enforce a lien upon lands and buildings, the court has no power to declare a lien upon other property. This particular money, when deposited, became the money of Mapes & Son. The plaintiff admits this in his complaint. Their contract with Livingston provided that, in case liens were filed, he might deposit with the clerk a sum sufficient to discharge the same, " and such deposit shall be deemed a payment under this contract on account of said work." Livingston made this deposit at the request of Mapes & Son. In their request they directed him " to deduct the amount out of the money due us on the fourth payment on the house." It was a payment to Mapes on account, and could no more be reached by a mechanic's lien subsequently filed than it could if the payment had been made directly to Mapes and been deposited in the bank by him. The claim of the assignee to this fund must be sustained.

The conclusion of the whole matter is that there should be judgment in this action that the property of Livingston at Highland is chargeable under the Mapes contract with the sum of $4,604.50, with interest; that Brown & Son are entitled to be first paid the sum of $1,350, with interest from January 15, 1896; that Dain's Sons are then entitled to be paid the amount of their lien, being the sum of $2,794.28, with interest from December 19, 1895, and that any balance of the sum so found to be due be applied upon the claim of Brown & Son for $4,446 (less $1,350), with interest from January 20, 1896.